925 A.2d 147

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Terry BROWN a/k/a Antonio Lambert, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 17, 2005.

Decided June 26, 2007.

Hugh J. Burns, Jr., Philadelphia, Jonathan M. Levy, for Commonwealth of Pennsylvania.

Fortunato N. Perri, Jr., Philadelphia, S. Philip Steinberg, for Terry Brown.

CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## *OPINION*

Justice CASTILLE.

■ In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the U.S. Supreme Court held that a defendant "is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh,* 481 U.S. 200, 201–02, 107 S.Ct. 1702, 1704, 95 L.Ed.2d 176 (1987) (summarizing holding of *Bruton* ). *Bruton* exists as a "narrow exception" to the general rule that cautionary instructions to the jury may be sufficient to eradicate the

prejudice that may arise where evidence is admitted against only one of multiple defendants in a joint trial. *Commonwealth v. Travers,* 564 Pa. 362, 768 A.2d 845, 847 (2001); *see also Commonwealth v. McCrae,* 574 Pa. 594, 832 A.2d 1026, 1037 (2003) ("general rule" in circumstance where evidence is admitted solely against one of multiple defendants "is that an instruction to the jury that it is to consider the evidence only with respect to the defendant against whom it has been properly introduced is sufficient to remove any potential spillover prejudice to the defendant against whom the evidence was not admitted"), *cert. denied,* 543 U.S. 822, 125 S.Ct. 31, 160 L.Ed.2d 32 (2004). In this appeal, a panel of the Superior Court held that: (1) the trial prosecutor's discussion, in summation but not at trial, of the substance of the nontestifying co-defendant's confession (a confession which had been redacted to remove references to appellee and then admitted into evidence against the co-defendant) violated *Bruton* when the prosecutor referred to appellee by name; (2) because the prosecutor's comment violated *Bruton,* the cautionary charge proposed by the trial court upon defense objection was insufficient as a matter of law to dissipate prejudice to appellee; (3) the error was not harmless; and (4) the trial court abused its discretion in denying severance based upon the *Bruton* issue. This Court granted review to consider the propriety of the Superior Court's extension of *Bruton* to an instance involving the prosecutor's argument, the panel's concomitant holding that a cautionary charge was *per se* inadequate to dissipate the potential for prejudice, and the panel's finding that severance was required. For the reasons that follow, we hold that the prosecutor's comment in closing in this case, though improper, does not trigger *Bruton's per se* exception to the general rule that cautionary charges may be adequate to eliminate spillover prejudice in joint trials. We also hold that the potential for prejudice arising from the prosecutor's comment was curable by the cautionary charge that trial counsel declined. Finally, we find that the panel's ruling on the severance question was erroneous. Accordingly, we reverse the grant of a new trial and reinstate the judgment of sentence.

On the afternoon of February 23, 2001, Anthony Cheatham and Miguel Garcia drove around Philadelphia in Garcia's black Monte Carlo for several hours while smoking marijuana. Between 4:00 and 5:00 p.m., Garcia stopped to talk to appellee and introduced appellee to Cheatham. Cheatham moved to the back seat of the car and appellee entered the front passenger seat. Appellee informed Garcia that "he wanted to get high." During the ensuing drive to North Philadelphia, Garcia stopped the car and purchased Xanax pills, which all three men then shared. The pills made Cheatham sleepy and he asked Garcia to take him home. Notes of Testimony (N.T.), 6/4/02, at 95–99.

Garcia stopped at a Hess Gas Station located around the corner from Cheatham's house and purchased gasoline. Garcia then drove about half a block when appellee asked him to stop the car. Appellee exited the car and Garcia followed. Cheatham remained in the back seat and heard a gunshot, which sounded like it was fired nearby. Appellee returned to the car, followed by Garcia. Appellee had a gun in his hand and Garcia asked him, "what the f[——] did you just do?" Appellee responded, "Shut up and drive the f[——]ing car." Cheatham told Garcia that he wanted to be dropped off immediately. Garcia drove around for about five minutes before stopping to let Cheatham out of the car. Cheatham went to a friend's house where he went to sleep. *Id.* at 104–06.

At approximately 8:00 p.m. the same evening, Philadelphia Police Officers Robert Livewell and Carolyn Campbell responded to a radio call that there was an unconscious female at a nearby Hess Station. At the station, the officers found Mary Edmund laying face up near a gasoline pump, where Fire Department paramedics were attempting to resuscitate her. Ms. Edmund was taken to the hospital where she was pronounced dead at approximately 9:40 p.m. The victim died from a single bullet which had caused multiple injuries, as it entered Ms. Edmund's right upper breast, exited the lower breast, entered the abdomen, and then became lodged behind her left hip. *Id.* at 47–52, 68–69.

Later, on the same night of the murder, appellee and Garcia were joined in the Monte Carlo by another man, Donovan Weary. At approximately 3:00 a.m., Philadelphia Police Lieutenant Daniel MacDonald and Officer Brian Gress were in a marked police vehicle and noticed the black Monte Carlo driving with its lights out. Lieutenant MacDonald activated his overhead lights and shined a spotlight on the car. The car initially pulled over but then sped off, with the officers in pursuit. The chase ended when the Monte Carlo hit a patch of ice, careened onto the sidewalk, hit a couch and a trash pile, and came to a halt. Garcia jumped from the car with a silver handgun and fled, with Officer Gress in pursuit. Appellee and Weary also attempted to flee, but kept slipping on ice and were promptly arrested by Lieutenant MacDonald. Officer Gress apprehended Garcia a block away and also retrieved a .38–caliber revolver Garcia had abandoned in the backyard of a nearby home. Ballistics evidence established that the revolver was the Edmund murder weapon. N.T., 6/5/02, at 6–11, 21–22; N.T., 6/7/02, at 17.

Garcia and appellee were each charged with murder,[1] robbery,[2] criminal conspiracy,[3] and possession of an instrument of a crime,[4] and the matters were joined for trial. On July 20, 2001, appellee motioned to sever his trial from Garcia's, claiming inconsistent defenses. He also alleged that his confrontation rights would be violated by a joint trial because Garcia did not plan to testify and the Commonwealth planned to introduce Garcia's redacted statement to police. The trial court denied the motion. Although the record contains no pre-trial order or other pre-trial reference to redacting Garcia's police statement, it is apparent from what transpired at trial that the court and counsel had edited the statement to remove references to appellee by name and replace all references with neutral phrases such as "another guy" or "the

1. 18 Pa.C.S. § 2502.
2. 18 Pa.C.S. § 3701.
3. 18 Pa.C.S. § 903.
4. 18 Pa.C.S. § 907(b).

other guy." Appellee lodged no *Bruton*-based objection to the adequacy of the redaction.

At trial, Cheatham testified for the Commonwealth, outlining the circumstances of the murder as summarized above. In addition, Garcia's statement to police was entered into evidence, but only after the trial court cautioned the jury that it could be considered only against Garcia and not as evidence against appellee. The statement provided as follows:

Question: "Tell us what happened."

Answer: "It was me and another guy. We were driving around and we picked up a third guy. We copped a dime of weed off of him. One of the guys said want [sic] to go down to 7th and Pike to get some Xanies. We was going down north to get some Xanies, but I went to the Hess station at 15th and Cheltenham first. When we pulled out of the Hess station I was driving down 15th Street. There was a lady walking up 15th Street. It was dark. One of [sic] guys said stop, I know her, y'all. I stopped and . . . both of the other guys got out and went up to the lady. That's when I saw a tussle. The lady was backing up holding her purse. She yanked back, she resisted and I heard a gunshot. Then both guys ran to the car. We was high, we needed a little change. I didn't know that was going to go down."

Question: "What happened next?"

Answer: "They got in the car and I said what the f[——] happened. One of the guys said I banged the b[——], I ain't playing, I'm showing these niggers out here I'm not playing. She wouldn't give up her pocketbook or nothing, so I banged her. The other guy said I just ran. I told the first guy what the f[——], you didn't tell me you had a burner."

Question: "What is a burner?"

Answer: "A gun."

Question: "What kind of gun did the first guy have?"

Answer: "A .38. He showed it to me in my house after he shot the lady. After he shot the lady we went to my house and we went inside. He pulled it out in the kitchen. I told

him to put it away because my peoples was [sic] there. My mom told me to get the guy out of her house. We left my house and drove down North Philly."

Question: "Tell us how you and the other guys came to be arrested."

Answer: "I don't know exactly where we were at, but the cops stopped us and I pulled over first, but one of the guys said I'm not trying to get locked up, man, so I took off and the cops chased us. We crashed at 3rd and Cayuga and we all ran. One of the guys threw the burner at me and ran. I picked up the burner and ran for a block and just threw it."

Question: "Do you remember anything specific about the lady who was robbed and shot?"

Answer: "I remember she had a beige pocketbook. That's it."

Question: "Detective Mangioni is showing you a gun. Do you recognize it?"

Answer: "That's the gun."

Question: "Did the guy with the gun say anything to you when the police stopped you?"

Answer: "He told me to take the heater and run."

Question: "Did the three of you discuss anything after you were arrested?"

Answer: "We were downstairs and one of the guys said don't snitch because I ain't saying nothing."

N.T., 6/5/02, at 71, 81–84.

Garcia's defense at trial was mere presence, *i.e.*, he argued that he had no knowledge that a crime would occur and did not participate in the crime that unfolded. In the portion of her summation arguing Garcia's guilt, the prosecutor attempted to rebut Garcia's defense by suggesting that, if Garcia truly had nothing to do with the murder, he would have abandoned the killer after the commission of the murder. During this argument concerning Garcia, the prosecutor made reference to information in Garcia's police statement, a reference the Superior Court found implicated *Bruton* because the prosecutor referred to appellee by name in one instance, rather than

following the redaction and referring to him as "the guy" or "the other guy:"

> Cheatham says take me home, so they drop him off at his friend's house and he doesn't know from anything what they do after that. If Garcia had not been part of what happened, how easy would it have been for him to drop Lambert off, go home, tell his mother what happened, pick up the phone and call the police and say I was just with a guy who shot and killed somebody? He doesn't do that. What does he do is this, **he takes Lambert to his house.** They're at his house and he says the guy I'm with brings the gun into my house and I tell him put it away because my people are there.
>
> [DEFENSE COUNSEL]: May we see the Court?
>
> THE COURT: I'm going to permit argument. Go ahead.
>
> [THE PROSECUTOR]: He takes him home and he says that the guy he's with had the gun in his house and he told him to put the gun away because my people were there. My mom told me to get the guy out of her house. We left my house and drove to North Philly.
>
> He's still with the guy that did the shooting. He's not concerned about it. He's not afraid of him. What does he do? He drives around with him for a few more hours. They pick up Donovan Weary after they drop off Mr. Cheatham and now they're out of that area, they stay far away from where they know that they're wanted, where they know that the car may have been spotted and they head over to the eastern part of Philadelphia. Now, they're at 3rd and Hunting Park, 5th and Hunting Park, and its 3:20 in the morning. The homicide occurs before 8 o'clock p.m. It's now some seven hours later and they're still together. Garcia is not afraid of him, he's up there having fun with him still and Weary is in the car.

N.T., 6/7/02, at 103 (emphasis added).

At the close of the prosecutor's argument, defense counsel moved for a mistrial, articulating his objection as follows:

The reason for the mistrial is Your Honor will recall that the Court and counsel went through painstaking efforts to properly redact Mr. Garcia's statement and one of the first things [the prosecutor] did is whip it out and read from it and tell the jury that Mr. Garcia took Mr. Lambert back to his house with the gun and read the entire portion of that statement implicating Mr. Lambert as the other guy. In fact, told the jury that Mr. Lambert was the other guy.

Maybe she thought that before this case started she was going to have other evidence [] from someone else indicating that Mr. Lambert was in fact at Mr. Garcia's house, but there was no other evidence whatsoever, so I would suggest that [the prosecutor] blatantly disregarded the Court's order with respect to redaction and for that violation I would move for a mistrial.

N.T., 6/7/02, at 128. When the trial resumed following a weekend recess, the court denied appellee's mistrial motion, but offered to issue the following cautionary instruction:

Ladies and Gentlemen, in her closing argument [the prosecutor] told you that defendant Miguel Garcia drove defendant Antonio Lambert to his home. That is to Garcia's home. I instruct you that you may not—I'm sorry, I instruct you that you may not use the statement of Mr. Garcia as evidence that he drove Mr. Lambert anywhere or even that Mr. Lambert was in Garcia's automobile. As I told you before, you must not use the statement of Mr. Garcia in any way as evidence against Mr. Lambert.

N.T., 6/10/02, at 3. Counsel declined the instruction, expressing a belief that it would merely highlight the issue for the jury. The court then proceeded to issue its final charge to the jury, a charge which included a general instruction that the jury was to consider the evidence separately as to each defendant, and was not to consider evidence admitted against only one defendant as evidence against the other. *Id.* at 17, 20. In addition, with respect to Garcia's statement, the court cautioned the jury as follows:

Ladies and gentlemen, there is a rule which restricts use by you of the evidence offered to show that defendant Miguel

Garcia made a statement concerning the crime charged. A statement made before trial may be considered as evidence only against the defendant who made that statement. Thus, you may consider the statement as evidence against defendant Miguel Garcia if you believe that he made the statement voluntarily. You must not, however, consider the statement as evidence against defendant Antonio Lambert. You must not use the statement in any way against Mr. Lambert.

* * * *

And remember you may consider the statement as evidence against defendant Miguel Garcia only. You must not use the statement in any way against defendant Antonio Lambert.

*Id.* at 29–30, 33.

Following deliberation, the jury convicted appellee of first-degree murder, robbery, criminal conspiracy, and possession of an instrument of a crime. The trial court sentenced appellee to a mandatory life sentence for murder and lesser concurrent terms of imprisonment on the remaining convictions.

Appellee appealed to the Superior Court, claiming error in the trial court's ruling on his objection to the prosecutor's summation, and error in denying his pre-trial motion for severance. In a published opinion, a Superior Court panel found merit in both of appellee's claims, vacated the judgment of sentence, and remanded for a new trial. *Commonwealth v. Brown*, 853 A.2d 1029 (Pa.Super.2004). The panel concluded that the prosecutor's reference to appellee by name when referring to evidence derived from Garcia's redacted statement "vitiate[d] the effect" of the redaction and thereby violated *Bruton*. *Id.* at 1035. The panel rejected the Commonwealth's argument that the trial court's proposed jury instruction was sufficient to cure any harm, finding that the argument "fail[ed] to appreciate the limited value of curative instructions in the context of a *Bruton* violation." *Id.* The panel also found that the error was not harmless. *Id.* at 1035–

36. The panel went on to determine that the trial court had abused its discretion by failing to grant appellee's pre-trial motion to sever, and accordingly, ordered that any future trial be held separately. The panel found that appellee's and Garcia's defenses were in irreconcilable conflict because Garcia's statement identified appellee as the shooter. *Id.* at 1036–37.

The Commonwealth then petitioned this Court for allowance of appeal, which we granted with regard to the following issues:

1) Whether the rule set forth in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and its progeny dictates that in a joint trial, the proper redaction of a non-testifying co-defendant's out-of-court statement is negated in whole or in part by a prosecutor's improper reference to the statement in closing argument;

2) Whether, in such instance, cautionary/curative instructions to the jury may ever be adequate to remove the potential for prejudice from the prosecutor's reference; and

3) Whether the Superior Court erred in holding that the trial court abused its discretion in denying severance of the trials in this case?

*Commonwealth v. Brown,* 582 Pa. 669, 868 A.2d 1196 (2005).

## A.

The first two issues are inter-related and thus we will consider them together. Ordinarily, the question of the proper judicial response to the myriad of objections arising at trial, whether the objection involves the order or admissibility of evidence, or misstatements or "misconduct" on the part of counsel, *etc.,* is a matter within the trial judge's discretion, and an appellate court will reverse the judge's decision only for an abuse of discretion. *E.g., Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139, 1151, 1163 (2000), *cert. denied,* 532 U.S. 932, 121 S.Ct. 1381, 149 L.Ed.2d 307 (2001). The trial court does not have the same range of discretionary response, however, in an instance where *Bruton* directly applies, for if the trial event is controlled by *Bruton,* a cautionary charge is

deemed *per se* incapable of rectifying the Confrontation Clause error (assuming the error is not constitutionally harmless). Because the preliminary question of whether the prosecutor's statement in closing implicated the *per se* rule of *Bruton* is primarily one of law, this Court's analysis is not constrained by our perspective of review, and we owe no particular deference to the views of the courts below; instead, our review of the question of the applicability of the *Bruton* rule is plenary.

The Commonwealth argues that *Bruton, Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), and *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) stand for the proposition that a jury instruction is *per se* insufficient to protect a defendant's confrontation rights where a nontestifying co-defendant's statement is admitted at trial against the co-defendant only if (1) the statement explicitly refers to the defendant or is altered in such a way that the defendant's identity can be readily inferred, and (2) the statement powerfully incriminates the defendant. If, however, the co-defendant's statement is properly redacted, such that it removes the defendant's name without obviously revealing the omission, a jury instruction to consider the statement only against the co-defendant who made it is presumptively sufficient to protect the defendant's confrontation rights. Commonwealth's Brief at 14–15 (citing *Gray,* 523 U.S. at 195, 118 S.Ct. at 1156, and *Travers,* 768 A.2d at 851). The Commonwealth notes that such an instruction has been held to be sufficient under *Bruton* even where other evidence may lead the jury to speculate or infer that the defendant is the unnamed person referred to in the co-defendant's statement. In the case *sub judice,* the Commonwealth argues, the redaction of Garcia's statement was proper, as any reference to appellee by name was replaced with neutral phrases like "one guy" or "the other guy." This redaction, along with the trial court's accompanying jury instruction to consider Garcia's statement only against Garcia, the Commonwealth contends, satisfied *Bruton* and its progeny.

Because the redaction and jury instructions were proper, the Commonwealth argues, *Bruton's per se* rule is not implicated, but rather, the case poses a distinct claim arising from the trial court's response to the defense objection to the prosecutor's closing, in which she identified appellee by name when describing the actions of "the other guy" referred to in Garcia's statement. The Commonwealth contends that a claim that falls outside of the *Bruton* evidentiary paradigm presumptively is subject to the usual sort of trial objection/discretionary court response analysis, an analysis that admits of a role for cautionary instructions to eliminate or minimize prejudice. In this regard, the Commonwealth cites *Commonwealth v. McCrae*, where this Court recently stressed that *Bruton* only applies "in the context that gave rise to the decision, *i.e.*, the introduction of a powerfully incriminating statement made by a non-testifying co-defendant at a joint trial." Commonwealth's Brief at 20 (quoting *McCrae*, 832 A.2d at 1035). Because the context of the reference here is not the evidentiary context at issue in *Bruton*, the Commonwealth argues that *Bruton* simply does not apply.

Finally, the Commonwealth argues that, when the prosecutor's statement is viewed in context, it is clear that a cautionary charge would have been adequate to address any possible prejudice. The Commonwealth notes that the challenged comment occurred during the prosecutor's argument concerning Garcia's guilt and her general point was consistent with other testimony respecting Garcia. Specifically, the Commonwealth notes that Cheatham testified that appellee was still in the car with Garcia along with the murder weapon when he exited the vehicle, and the police officers testified that Garcia and appellee were together seven hours later. From these facts, the Commonwealth argues, the prosecutor properly inferred and argued that the two men remained together until they were arrested. The point the prosecutor was making in the challenged portion of her closing—that Garcia had the opportunity to part ways with appellee and likely would have had they not been conspirators—therefore was proper. The Commonwealth concedes that the prosecutor's reference to

Garcia and appellee going to Garcia's house is "potentially problematic," but argues that this misstatement was at worst an isolated reference that was curable by appropriate instructions.[5] Furthermore, the Commonwealth claims that the remark did not bear upon appellee's guilt because merely going to Garcia's house did not implicate appellee in the earlier crime. For these reasons, the Commonwealth believes that the curative instruction proposed by the court, and rejected by appellee, was sufficient to remove any prejudice the prosecutor's reference might have created, and thus the trial court's response to the objection cannot be viewed as reversible error.

Appellee responds first by disputing the Commonwealth's claim that *Bruton* does not apply at all. Appellee cites *Commonwealth v. Miles*, 545 Pa. 500, 681 A.2d 1295 (1996), *cert. denied*, 520 U.S. 1187, 117 S.Ct. 1472, 137 L.Ed.2d 684 (1997), a capital direct appeal in which this Court stated that the prosecutor's "inadvertent use" of the appellant's nickname in closing when reading from the nontestifying co-defendant's statement violated *Bruton*, but the violation was harmless given overwhelming evidence of guilt.[6] *Id.* at 1301. Appellee argues that the prosecutor's comment in the case *sub judice* likewise undid the protective redaction of Garcia's statement, which allowed the jury to use Garcia's statement against appellee, triggering *Bruton*. Because the other evidence of guilt was not overwhelming, appellee claims, the Superior Court's grant of a new trial was appropriate.

Appellee further disputes the Commonwealth's claim that the prosecutor's remarks merely implied what role appellee

---

**5.** The Commonwealth also argues that Garcia's statement was not the only evidence that appellee had the gun and remained in the car with Garcia after the crime because Cheatham had independently testified to similar facts. The Commonwealth thus contends that, if the jury concluded from Cheatham's direct testimony that the unidentified person in Garcia's statement was appellee, this is an incident of contextual implication, which is permissible. Commonwealth's Brief at 22 (citing *Richardson*, 481 U.S. at 208, 107 S.Ct. at 1707–08). In light of the fact, which is undisputed by the Commonwealth, that Garcia's statement was the only source suggesting that Garcia took appellee to his house, the Commonwealth's argument fails.

**6.** Appellee did not invoke the *Miles* case in forwarding his objection to the trial court.

played in Garcia's account. Appellee asserts that, by using appellee's name, the prosecutor explicitly informed the jury that he was "the guy" with the gun who stayed with Garcia after the killing. Appellee also disputes the Commonwealth's argument that Cheatham's testimony supported the inference that appellee and Garcia remained together after the murder. Appellee claims that there was no other evidence directly placing him in Garcia's home with the gun. Appellee characterizes the prosecutor's statement here as "actual inculpation," not contextual implication, which renders *Richardson* inapplicable. Moreover, in appellee's view, the fact that the prosecutor immediately followed her use of appellee's name with references to "the guy" Garcia said he was with reinforced for the jury that appellee was that "guy."

Finally, appellee argues that a mistrial was the only appropriate remedy because the primary evidence against him was the testimony of Cheatham, a possible accomplice in the crime, with a motive to lie and avoid prosecution. Appellee further argues that the prosecutor's comment was not harmless and was not curable by a jury instruction because the comment opened the door to the jury considering another source of incriminating information, which corroborated Cheatham's testimony in part. Because the evidence was not overwhelming, appellee claims, the instructions (both the charge offered and declined and the general instructions that were issued) were inadequate, as a matter of law, to dissipate the harm arising from the prosecutor's statement.[7]

7. Appellee also asserts that the prosecutor had Garcia's statement in her hand when she referred to appellee by name, and suggests that this fact demonstrates that the prosecutor acted with "malicious intent." Citing a fifteen year-old Superior Court decision, appellee extrapolates from the inference of "malice" he detects a general charge against the Philadelphia District Attorney's Office, saying that the conduct here was both deliberate and typical, and argues that the new trial award should stand to "send a message" to that office. Appellee's Brief at 18. Appellee did not forward this broad-based accusation below, and the trial court made no finding of a "malicious" motivation or pattern of conduct. Accordingly, we will not pass upon appellee's belated and unsupported accusation here.

Included in the scope of the right guaranteed by the Sixth Amendment's Confrontation Clause is the right to cross-examine witnesses. *Richardson*, 481 U.S. at 206, 107 S.Ct. at 1706–07. Generally, at a joint trial, a witness's testimony is not considered to be "against" a defendant if an instruction is given to the jury to consider that evidence only against a co-defendant. *Id.* The general presumption in the law is that juries will abide by such instructions. *McCrae*, 832 A.2d at 1037; *Travers*, 768 A.2d at 847. In *Bruton*, however, the U.S. Supreme Court recognized that there are some instances where "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135, 88 S.Ct. at 1627. The *Bruton* Court held that, if a nontestifying co-defendant's confession directly and powerfully implicates the defendant in the crime, then an instruction to the jury to consider the evidence only against the co-defendant is insufficient, essentially as a matter of law, to protect the defendant's confrontation rights. *Id.* at 135–37, 88 S.Ct. at 1628; *Gray*, 523 U.S. at 192, 118 S.Ct. at 1155 (citing *Richardson*, 481 U.S. at 207, 107 S.Ct. at 1707).

*Bruton*, however, is not the last word from the Court concerning how to treat co-defendant statements in joint trials. In *Richardson v. Marsh*, the Supreme Court held that the Confrontation Clause is not violated by the "admission of a non-testifying co-defendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. at 211, 107 S.Ct. at 1709. This Court had previously approved of such a practice in the wake of *Bruton*. *See Commonwealth v. Johnson*, 474 Pa. 410, 378 A.2d 859, 860 (1977). We have also held that substituting the neutral phrase "the guy" (as occurred here) for the name of the defendant is an appropriate manner of redaction under *Bruton*. *Travers*, 768 A.2d at 851.

The case *sub judice* does not pose a classic *Bruton* circumstance—*i.e.*, the issue is not an evidentiary one involving the

redaction itself and the effect of the statement as redacted and as subject to a cautionary charge. Nevertheless, we are not entirely without guidance. Indeed, in *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), issued a year after *Bruton,* the U.S. Supreme Court considered the applicability of *Bruton* in a non-evidentiary setting. In *Frazier,* the appellant claimed that his confrontation rights were violated by the prosecutor's opening statement, which summarized inculpatory testimony the prosecutor expected from a co-defendant who was indicted for the same crime, pleaded guilty, and was awaiting sentencing. The appellant's trial lawyer had informed the prosecutor before trial that the co-defendant would invoke his privilege against self-incrimination and refuse to testify, and thus warned the prosecutor not to rely in his opening statement upon the co-defendant's account. The prosecutor replied that he had reason to believe, from separate sources, that the co-defendant would testify, and thus, in his opening, he summarized the testimony he expected from the co-defendant. When the co-defendant was called to the stand, however, he invoked his privilege against self-incrimination and refused to testify. The appellant moved for a mistrial, which the trial court denied, but the court did instruct the jury that it could not consider any statement made by counsel as evidence.

The Supreme Court, per Justice Thurgood Marshall, held that this instruction was sufficient to protect the appellant's confrontation rights. *Id.* at 733–36, 89 S.Ct. at 1423. In so holding, and in distinguishing the case from *Bruton,* the Court noted, among other things, that the jury was not being asked to perform "the mental gymnastics of considering an incriminating statement against only one of two defendants in a joint trial." *Id.* at 735, 89 S.Ct. at 1423. In addition, the Court noted that *Bruton* itself had recognized that " '[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently.' " *Id.* at 735, 89 S.Ct. 1420 (quoting *Bruton,* 391 U.S. at 135, 88 S.Ct. at

1627). Finally, the *Frazier* Court noted that "[e]ven if it is unreasonable to assume that a jury can disregard a coconspirator's statement when introduced against one of two joint defendants, it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial." *Id.* at 736, 89 S.Ct. at 1423.

*Frazier* is not an anomaly. In *United States v. Sandini,* 888 F.2d 300 (3d Cir.1989), the appellant was tried jointly with his co-defendant for criminal conspiracy. The co-defendant's attorney conceded the guilt of both defendants in his closing argument, and the appellant failed to object. The issue on appeal was whether the federal court plain error doctrine required the grant of a new trial. In rejecting this claim, the Third Circuit held that *Bruton* does not apply "when the attorney for a co-defendant implicates a defendant during a closing argument ... because the arguments of counsel are simply not evidence." *Id.* at 310–11; *accord United States v. Espinosa,* 771 F.2d 1382, 1398–1400 (10th Cir.1985) (jury instruction deemed adequate where incriminating comments were made by *pro se* co-defendant during opening statement) (applying *Frazier*).

More recently, in *Commonwealth v. McCrae,* 574 Pa. 594, 832 A.2d 1026 (2003), this Court considered a situation where the testimony at issue was that of a witness who had testified at the co-defendant's preliminary hearing. When the witness proved unavailable at the joint trial, his preliminary hearing testimony was redacted to remove references to the appellant and, as redacted, introduced against the co-defendant only. In both his opening and closing remarks, however, the prosecutor implicated the appellant as "the guy" referred to in the witness's redacted preliminary hearing testimony. On appeal following conviction, the appellant argued that the prosecutor's statements violated *Bruton.* This Court held that *Bruton* applies

> only in the context that gave rise to the decision, *i.e.,* the introduction of a powerfully incriminating statement made by a non-testifying co-defendant at a joint trial. *Bruton* is

inapplicable to statements made by an individual other than a non-testifying co-defendant at a joint trial of co-defendants.

*McCrae,* 832 A.2d at 1038 (internal citations omitted). The *McCrae* Court then turned to the broader and subsumed question of whether the appellant's confrontation rights were violated, even in the absence of a *Bruton* violation. We found that there was other evidence linking the appellant to the crime, and therefore determined that the trial court's limiting instructions sufficiently protected the appellant's confrontation rights. *Id.* at 1039.

█ Here, as in *Frazier, Sandini,* and *McCrae,* the objectionable event involves non-evidentiary commentary by counsel, and not the co-defendant/introduction of evidence paradigm at issue in *Bruton.* The U.S. Supreme Court, which fashioned the *per se Bruton* rule, has not extended its reach to comments by counsel; indeed, the *Frazier* Court at least suggested that commentary from counsel was not on a par with the co-defendant/evidentiary paradigm. This Court's jurisprudential task is to attempt to predict whether and when the High Court might extend the constitutional rule to commentary from counsel. We have little doubt that there could be a circumstance, more egregious than *Frazier,* where the Court would find that a prosecutor's commentary respecting *Bruton*-redacted and-limited evidence might raise the prospect that "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton,* 391 U.S. at 135, 88 S.Ct. at 1627. Indeed, the *Frazier* Court was careful to emphasize the relatively benign aspects of the situation there presented (such as the fact that the co-defendant's evidence was not "touted to the jury as a crucial part of the prosecution's case," 394 U.S. at 736, 89 S.Ct. at 1423). Moreover, at the same time the *Frazier* Court recognized that not every trial error could be deemed "reversible error unavoidable through limiting instructions," it also recognized that "[i]t may be that some remarks included in an opening or closing

statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable." *Id.* at 735–36, 89 S.Ct. at 1423.

There is no point in redacting and sanitizing otherwise inculpatory statements of a non-testifying co-defendant, to facilitate a joint trial, if that protective measure approved by the High Court to comport with the Confrontation Clause could be deliberately and directly undone by lawyer commentary. Consider, for example, if the redacted evidence would be powerfully incriminating if tied to the defendant, and the prosecutor were to say something along the lines of: "You heard the co-defendant's confession, which also described the actions of someone he identified only as 'the other guy;' well, I'm here to tell you that 'the other guy' he was speaking of was the defendant and we just changed the wording of the statement." The *Frazier* case, of course, did not involve a deliberate attempt to undo a proper redaction, and thus it did not involve the prospect of prosecutorial conduct which would affect the use the jury could make of evidence from a nontestifying co-defendant's statement which was actually introduced against the co-defendant at trial. We have no doubt that, in an appropriate case, the High Court would approve application of the *per se Bruton* rule to an instance where the objection is to argument by counsel concerning *Bruton*-redacted evidence. Indeed, the government obviously has a difficult task in arguing that a jury in a joint trial may easily perform the "mental gymnastics" required by *Bruton* if the trial prosecutor, learned in the law, intentionally betrays difficulty in keeping the evidence separate.

Here, we do not condone the prosecutor's misstatement (and neither did the trial judge, as he offered a curative charge) and we stress the special obligation upon the prosecution when trying defendants jointly in a circumstance where *Bruton* redaction is implicated. Nevertheless, we conclude that the circumstances were not so egregious that *Bruton's per se* rule is implicated, so as to displace the traditional, discretionary role of the trial court in fashioning an appropriate response. The prosecutor's statement, though plainly

improper, affected the redaction only indirectly and by inference. Moreover, the error occurred in the context of an argument attempting to rebut co-defendant Garcia's claim of non-involvement. The revelation of appellee's name when speaking of the stop at Garcia's house, though troublesome, concerned a point in time after the actual killing, and it did not directly inculpate appellee in the murder beyond the evidence properly introduced through Cheatham concerning appellee's role in the murder. Moreover, the reference was isolated and, following the objection, the prosecutor made no further improper reference to the redacted statement. In light of the context and circumstances of the misstatement, and the teaching of *Frazier*, we hold that *Bruton's per se* rule does not apply.[8]

8. *Commonwealth v. Miles*, 545 Pa. 500, 681 A.2d 1295 (1996), upon which appellee relies, involved a co-defendant's statement which was redacted to substitute the symbol "X" for the appellant's name—a form of redaction which, it should be noted, would not pass muster under current law. *See Gray*, 523 U.S. at 192, 118 S.Ct. at 1155 ("Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration ... leave statements that, considered as a class, so closely resemble *Bruton's* unredacted statements that, in our view, the law must require the same result."). In closing argument, the prosecutor, when reading a portion of the co-defendant's statement, inadvertently employed the appellant's nickname (of which the jury was aware), rather than "X." No objection was raised, and thus the trial court did not address or minimize the effect of this misstatement. The issue was considered on appeal, notwithstanding its waiver, under the capital case relaxed waiver doctrine, a doctrine later abrogated in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 402–03 (2003). On appeal, Miles stressed the absence of any "special efforts to protect the jury from using [the co-defendant's] statements against [the appellant]" as proof of *Bruton* error. *Miles*, 681 A.2d at 1301. In the course of finding harmless error, given the overwhelming evidence of guilt, this Court opined, with no elaboration, that "the inadvertent use of [the appellant's] nickname [when reading from the co-defendant's confession] was a violation of the *Bruton* rule." *Id.*

*Miles* is distinguishable from this case. First, the prosecutor in *Miles* actually read from the co-defendant's statement while inserting the appellant's nickname; here, in contrast, the prosecutor's reference was not so directly tied to the statement. Second, in *Miles*, there was no objection, and no curative charge proffered. Third, the *Miles* Court did not consider the impact of the U.S. Supreme Court's decision in *Frazier*, and the distinction between *Bruton* error arising from the introduction of the co-defendant's statement and error premised upon counsel's

■ Turning to the sufficiency of the trial court's response to the objection here, we are satisfied that there was no abuse of discretion. Again, the prosecutor's statement was confined to a single comment in an argument concerning co-defendant Garcia's guilt. The curative instruction offered by the court was direct, unequivocal, and strong, including that Garcia's statement was not to be considered as evidence that Garcia "drove [appellee] anywhere or even that [appellee] was in Garcia's automobile." The trial court, of course, was in the best position to assess whether the circumstances were such that the misstatement was curable. Appellee's counsel then rejected the curative charge as a strategic matter. However, the court previously had repeatedly instructed the jury that it could consider Garcia's statement only as evidence against Garcia and, in its general charge, it instructed the jury that the arguments of counsel were not evidence. The general instructions issued, as well as the charge proffered but declined, were adequate to remove any prejudice. Accordingly, we find that the trial court committed no error and that the Superior Court, consequently, erred in awarding a new trial on grounds that the prosecutor's argument triggered and violated the *Bruton* rule.

## B.

We turn now to the related but distinct question of whether the Superior Court properly found that the trial court abused its discretion in denying appellee's pre-trial motion for severance. If the Superior Court was correct, the severance ruling would be an independent basis for ordering a new trial. However, we conclude that the panel erred.

argument. Fourth, and relatedly, the consideration in *Miles* was brief, as is frequently the case in capital appeals, as opposed to cases considered on discretionary review, where discrete issues are more narrowly focused, developed by the parties, and explored in the opinion. Fifth, since *Miles*, this Court has considered the nature of a *Bruton* objection at greater length in cases such as *McCrae*. And, finally, the actual basis for the decision in *Miles* was harmless error. For these reasons, we do not view the sentence in *Miles* which is relied upon by appellee to be determinative.

 Severance questions fall within the discretion of the trial judge and an order denying severance will not be overturned on appeal absent an abuse of discretion. *Commonwealth v. Rivera,* 565 Pa. 289, 773 A.2d 131, 137 (2001); *Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 771 (1998), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000).[9] When conspiracy is charged, a joint trial generally is advisable. *King,* 721 A.2d at 771; *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1372 (1991), *cert. denied,* 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991). In ruling upon a severance request, the trial court should consider the likelihood of antagonistic defenses. *Chester,* 587 A.2d at 1373; *Rivera,* 773 A.2d at 137. A claim of mere hostility between defendants, or that one defendant may try to exonerate himself at the expense of the other, however, is an insufficient basis upon which to grant a motion to sever. *Chester,* 587 A.2d at 1373. Indeed, this Court has noted that " 'the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together.' " *King,* 721 A.2d at 771 (quoting *Chester,* 587 A.2d at 1373). Instead, severance should be granted only where the defenses are so antagonistic that they are irreconcilable—*i.e.,* the jury essentially would be forced to disbelieve the testimony on behalf of one defendant in order to believe the defense of his codefendant. *Commonwealth v. Williams,* 554 Pa. 1, 720 A.2d 679, 685 (1998), *cert. denied,* 526 U.S. 1161, 119 S.Ct. 2052, 144 L.Ed.2d 219 (1999); *Commonwealth v. Lambert,* 529 Pa. 320, 603 A.2d 568, 573 (1992); *Chester,* 587 A.2d at 1373. Thus, a defendant claiming error on appeal has the burden of demonstrating that he suffered actual, not speculative, prejudice because of the ruling permitting a joint trial. *Rivera,* 773 A.2d at 137.

9. Although review of the trial court decision is deferential since discretion is involved, our review of the Superior Court's finding of legal error in the trial court's exercise of its discretion is plenary and non-deferential.

The Commonwealth argues that appellee's defense was not in prejudicial conflict with that of Garcia. The Commonwealth notes that appellee did not blame Garcia for the crime; instead, his defense was one of innocence. Likewise, Garcia's redacted statement did not implicate appellee; rather, Garcia identified two unnamed "other guys" as the persons who left the car and accosted the victim, one of whom admitted he shot her, while Garcia maintained that he stayed in the car. Accordingly, the Commonwealth argues that there was no conflict between the defenses and the trial court did not abuse its discretion in permitting appellee and Garcia to be tried together. The Commonwealth also cites *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 501–02 (1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996), as an example of a case where this Court found no abuse of discretion in denying severance even though the co-defendants claimed they killed the victim on the orders of the appellant, because the trial court's instruction cured any prejudice. The trial court's denial of severance here was proper under *Jones*, the Commonwealth submits:

Appellee responds that severance was required because Garcia's statement could not be sufficiently redacted to remove all references to appellee. Citing *Commonwealth v. Marsh*, 388 Pa.Super. 610, 566 A.2d 296, 298 (1989), appellee argues that the Superior Court has held that, if the jury in a joint trial can identify the defendant from the co-defendant's statement, it is proper to find prejudice in the statement's admission. Appellee argues that, if redaction does not adequately remove the prospect of spillover prejudice, other remedies, including severance or exclusion of the co-defendant's statement, are appropriate. Here, appellee claims, the jury could have assumed from other evidence that appellee was the "other guy" referred to in Garcia's statement and, for that reason, the statement could not be properly redacted. Accordingly, appellee argues, the Superior Court properly found that the trial court abused its discretion in denying the motion to sever.

In its opinion, the trial court noted that the basis for appellee's severance request was that he would be unable to cross-examine Garcia concerning his redacted statement. The trial court discussed the relevant case law at some length, and then noted that there was no irreconcilable conflict between appellee's defense and that of Garcia. Trial Ct. Op. at 12. Furthermore, with respect to appellee's specific concern that he would be unable to cross-examine Garcia, the court discussed *Bruton, Gray, Richardson,* and *Travers* and noted that redaction coupled with a cautionary charge was an approved method of addressing claims premised upon the Confrontation Clause. The trial court then noted that Garcia's statement was properly redacted so as not to refer to appellee by name or other indication and the jury was appropriately instructed so that admission of Garcia's statement, against Garcia alone, did not violate appellee's confrontation rights. Finally, the court noted that appellee's concern that the jury might conclude that he was one of the "other guys" referred to in Garcia's statement by considering other, properly admitted evidence, did not require severance because the governing case law—specifically the U.S. Supreme Court's decision in *Richardson v. Marsh* and this Court's decision in *Commonwealth v. Travers*—had rejected such a theory of contextual implication.

The trial court did not abuse its discretion in denying severance. Conspiracy was charged against both defendants, the other crimes charged were essentially the same, the circumstances giving rise to the murder were the same, and Cheatham's testimony was the key evidence against both defendants. *See King, supra.* Moreover, as the court noted, the defenses were not in irreconcilable conflict, particularly since Garcia's statement, as redacted, did not refer to appellee by name or other indication. In addition, the primary challenge for both defendants was the same: to convince the jury not to credit Cheatham's testimony. The jury did not have to disregard the defense of appellee in order to accept the defense of Garcia. Thus, the defenses were not so antagonistic as to require severance.

The Superior Court's contrary analysis erroneously assumed that Garcia's statement, which was not introduced as evidence against appellee, identified appellee as the shooter. The panel also speculated that the jury "likely ... inferred" that appellee was " 'the guy' that Garcia said showed him the gun at Garcia's house" and " 'the guy' Garcia said gave him the gun as they exited Garcia's car in fleeing from the police." *Brown,* 853 A.2d at 1037. In fact, Garcia's statement as redacted did not identify appellee, or his role, at all. Moreover, the panel's speculation concerning what the jury "inferred" respecting the role appellee played in the scenario recited in Garcia's statement is premised upon a misguided assumption that juries ignore *Bruton* limiting instructions. The panel's analysis in this regard is squarely at odds with the law that has developed in the *Bruton* line of cases. Hence, we hold that the panel erred in finding that the trial court abused its discretion in denying severance.

For the foregoing reasons, we reverse the order of the Superior Court granting a new trial and we reinstate the judgment of sentence. Jurisdiction is relinquished.

Former Justices NIGRO and NEWMAN did not participate in the decision of this case.

Justice SAYLOR and EAKIN join the opinion.

Justice BAER files a dissenting opinion in which Chief Justice CAPPY joins.

Justice BAER, Dissenting.

I fully join the Majority in finding improper the prosecutor's closing argument revealing defendant, Terry Brown ("Appellee"), as the "guy" in the previously redacted statement of Miguel Garcia, his non-testifying co-defendant. Maj. Op. at 398–99, 925 A.2d at 159–60. Respectfully, I diverge from the Majority premised upon my conviction that this type of error is never amenable to curative instructions. Rather than viewing this as a category distinct from the typical violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20

L.Ed.2d 476 (1968), I conclude that a prosecutor's unmasking of a defendant's redacted identity is a sub-category of *Bruton* violation, subject to *Bruton's per se* rule that jury instructions cannot remedy the "spillover" prejudice resulting from a non-testifying co-defendant's statement. Because I conclude that *Bruton* applies to the prosecutorial references here in question, it would remain for me only to determine whether the error in question was harmless. As discussed below, I conclude that the violation was not harmless and, consequently, I would affirm the Superior Court's determination that the *Bruton* violation necessitates a remand for a new trial.

A defendant "is deprived of his rights under the Confrontation Clause when his non-testifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh,* 481 U.S. 200, 201–02, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Bruton,* the United States Supreme Court explained why no jury instruction can cure this type of prejudice:

[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

*Bruton,* 391 U.S. at 135–136, 88 S.Ct. 1620 (internal citations omitted).

For the same reasons, I believe that a defendant is equally deprived of his rights under the Confrontation Clause if an otherwise effective redaction is corrupted by a prosecutor's comment. The jury is no less aware of the import of the co-defendant's implication of the defendant, and the defendant is no more able to cross-examine the co-defendant than in a more conventional *Bruton* scenario. As with the typical *Bruton* violation, we cannot assume that a jury will be able to perform the necessary "mental gymnastics" of limiting its consideration of an incriminating statement as against the confessing co-defendant and not against the defendant following the improper revelation of his previously redacted identity. *Frazier v. Cupp,* 394 U.S. 731, 735, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). Accordingly, I find no justification for a divergent analysis for the undoing of a redaction than that applied to an originally improper redaction.

The Majority reaches a different conclusion, based in part on the decision in *Commonwealth v. McCrae,* 574 Pa. 594, 832 A.2d 1026 (2003), which I find distinguishable. In that case involving a joint trial of two defendants, a witness testified at a preliminary hearing and implicated both of the defendants. However, at the time of the preliminary hearing, only one of the defendants had been charged, and thus, only that defendant had the opportunity to cross-examine the witness. By the time of the defendants' joint trial, however, the witness had become unavailable. To address the situation, the trial court admitted the witness's statement only after it was redacted to remove references to the later-charged defendant, who had no opportunity to cross-examine the witness. Notwithstanding the redaction, the prosecutor in his opening statement and closing argument linked the witness's statement to the defendant whose name had been redacted. This Court found no *Bruton* violation had occurred, however, because the statement in that case was that of a witness to a crime and not a co-defendant.

While the Majority emphasizes the fact that the alleged violation in *McCrae*, as in the case at bar, came in the form of a prosecutor's statements undoing the trial court's redaction, the analysis in *McCrae* focused on the identity of the statement's author, rather than how the redacted information was revealed:

> Appellant's claim ... pivots on the faulty presumption that the *Bruton* rule applies to [the witness's] testimony. It does not. The statement here was not made by [a co-defendant]. Moreover, [the witness] was never charged in relation to the criminal incident, let alone tried jointly with appellant. It is the particularly "devastating" prejudicial effect and inherent "unreliability" of a directly incriminating statement made by a **non-testifying co-defendant** that powered *Bruton's* exception to the general rule that cautionary charges are enough to avoid spillover prejudice in joint trials. [*Bruton*, 391 U.S. at 136, 88 S.Ct. 1620.] These concerns are simply not present in the instant context involving the statement of a non-party eyewitness to the crime.

*Id.* at 1038 (emphasis in original). The Court therefore concluded, "*Bruton* is inapplicable to statements made by an individual other than a non-testifying co-defendant at a joint trial of co-defendants." *Id.*[1] Because the case at bar involves a *Bruton*-governed statement of a co-defendant rather than a

---

1. Notably, the Court was not united in its conclusion that the undoing of a witness's redacted statement was categorically different from typical *Bruton* violations.

 On the broader legal points involved, while I agree with the Majority that the United States Supreme Court's specific holding in [*Bruton*] is not controlling here, I would not apply as categorical an approach to the Sixth Amendment principles underlying *Bruton* as the Majority seems to apply. In particular, I would not exclude the possibility that such principles might render cautionary instructions insufficient to prevent the possibility of spillover prejudice in some larger set of circumstances analogous to, but not overlapping with, those before the United States Supreme Court in *Bruton*.

 *McCrae*, 832 A.2d at 1041 (Saylor, J., concurring, joined by Cappy, C.J., and Nigro, J.). The concurring justices, however, agreed that any error committed was harmless.

witness, I conclude that our decision in *McCrae* is distinguishable.

Similarly, unlike the Majority, I find the decision in *Frazier v. Cupp* distinguishable. In *Frazier*, the Court considered whether the rule in *Bruton* applied to a prosecutor's opening statements. In that case, an alleged accomplice of the defendant pleaded guilty and was awaiting sentencing at the time of the defendant's trial. The prosecutor in opening statements in the defendant's case referred to the expected testimony of the accomplice. At trial, however, the accomplice invoked his privilege against self-incrimination on the witness stand and declined to testify. The defendant claimed that this violated *Bruton* because the prosecution had the benefit of placing a testimonial-like statement before the jury, without subjecting the speaker to cross-examination. The Court focused on the fact that the case did not involve a statement of a co-defendant in a joint trial, but instead related to a prosecutor's commentary in an opening statement on what evidence *might* be introduced later during trial.

> It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. * * * Even if it is unreasonable to assume that a jury can disregard a coconspirator's statement when introduced against one of two joint defendants, it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial.

*Frazier*, 394 U.S. at 736, 89 S.Ct. 1420 (quotation marks omitted).

Unlike in *Frazier*, the statement at issue in this case was a statement of a non-testifying co-defendant introduced into evidence at a joint trial of co-defendants.[2] It is beyond cavil

**2.** Additionally, I find the Majority's reliance on *United States v. Sandini*, 888 F.2d 300 (3d Cir.1989), and *United States v. Espinosa*, 771 F.2d 1382 (10th Cir.1985), untenable because neither involves an improper

that the co-defendant's statement itself falls under the protections provided by *Bruton*. In my mind, the form of the violation, in this case the reference in the prosecutor's closing statement, cannot be the basis for a legal distinction when the effect is to place directly before the jury "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant," where such statements cannot be tested by cross-examination. *Bruton*, 391 U.S. at 135–36, 88 S.Ct. 1620. The violation I find in this case arises because the prosecutor's improper reference in closing arguments effectively introduced the non-testifying co-defendant's statement to the jury as though it had never been redacted. Respectfully, this Court should not admit a violation of the fundamental right of confrontation and cross-examination by means of a back-door revelation, when *Bruton* so carefully guards the front door. As the Majority aptly notes: "There is no point in redacting and sanitizing otherwise inculpatory statements of a non-testifying co-defendant, to facilitate a joint trial, if that protective measure approved by the High Court to comport with the Confrontation Clause could be deliberately and directly undone by lawyer commentary." Maj. Op. at 398, 925 A.2d at 159. Accordingly, I maintain that a violation of the rule in *Bruton* occurred when the prosecutor, during her closing statement, effectively undid the *Bruton*-compliant redaction of the non-testifying co-defendant's statement admitted at trial.[3]

identification of the defendant by name in connection with a previously, properly redacted and admitted statement of a non-testifying co-defendant.

3. Although the discussion in the Majority Opinion and the arguments of the parties focus upon the prosecutor's reference to Appellee by name in connection with Garcia's statement at page 103 of the Notes of Testimony, minutes later the prosecutor again tied Appellee, by name, to Garcia's statement:

I submit to you that there wouldn't have been any fingerprints once that gun was in the snow and with all that tape around it, it got wet in the snow, the officers handled it to take it apart, the defendant's [sic] both handled it, so what fingerprints are you going to get on the tape? It's an old ugly gun, but it worked. It killed Mary Edmond. It did just what **Antonio Lambert [Appellee]** wanted it to do. He managed to shoot her. Why? Because she didn't give up her pocket-

When a *Bruton* violation has been found, the Court must consider whether the violation necessitates a new trial or merely constitutes harmless error under the circumstances in which it occurred.

> An error will be deemed harmless if: (1) the error did not prejudice the defendant or the prejudice was *de* [*minimis* ]; [or] (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. The Commonwealth bears the burden to prove harmlessness beyond a reasonable doubt.

*Commonwealth v. Markman,* 916 A.2d 586, 603 (Pa.2007) (internal citations and quotation marks omitted).

In the case at bar, I cannot conclude beyond a reasonable doubt that the *Bruton* violation did not contribute to the verdict. While the Commonwealth relies on the testimony of the eyewitness, Anthony Cheatham, his testimony is suspect because he is a potential accomplice in the crime. Moreover, his testimony, which implicated Appellee by name, is contradicted by co-defendant Garcia's statement, which, as redacted, did not implicate Appellee by name. The versions of events offered by Garcia and Cheatham differed as to whether Garcia or Cheatham accompanied the shooter (or Appellee in Cheatham's version) during the murder.[4] Additionally, at the time

> book. She resisted it. **And that's exactly what Mr. Garcia said in his statement.**

N.T., 6/7/02, at 106 (emphasis added). While there is no clear objection by defense counsel to this comment, the trial court had permitted argument to "go ahead" after the first comment without discussion of the objection. *Id.* at 104. Moreover, I find this second incident relevant to the harmless error analysis as it compounds the original *Bruton* violation.

**4.** The Majority recites the facts based on Cheatham's testimony without acknowledging the discrepancy between Cheatham and Garcia's versions of the events as described fully in the Superior Court's published decision, *Commonwealth v. Brown,* 853 A.2d 1029, 1031–1033 (Pa.Super.2004).

of the arrest, the murder weapon was controlled by Garcia, not Appellee. Finally, Garcia's statement is not cumulative of other evidence because it is the only evidence presented that spans the entire period from the murder to the arrest. While there is no indication of a nefarious intent by the prosecutor to vitiate the *Bruton*-compliant redaction, her comments nevertheless tied Appellee by name to the "other guy" referenced in Garcia's statement. While other incriminating evidence existed, Garcia's statement was important evidence placing Appellee alone with Garcia after the murder with the gun in Appellee's hand and corroborating Cheatham's testimony that Appellee was the shooter. Accordingly, I find a reasonable possibility that the error may have contributed to the verdict such that I cannot conclude that the error was harmless. Thus, I would affirm the Superior Court's decision to remand for a new trial.

Chief Justice CAPPY joins this Dissenting Opinion.